Tracy L. Klestadt
Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
Fax: (212) 972-2245
tklestadt@klestadt.com

Jeffrey K. Garfinkle (admitted *pro hac vice*)
Daniel H. Slate (California State Bar No. 78173)
BUCHALTER Professional Corporation
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612
Telephone: (949) 760-1121
Fax: (949) 720-0182
jgarfinkle@buchalter.com
dslate@buchalter.com

Hearing Date:
November 16, 2018
10:00 a.m.

Counsel for Attorneys for Defendants, McKesson Corporation,
McKesson Specialty Distribution Corporation and McKesson Pharmacy Systems LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re: | Chapter 11 |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | Case No. 15-23007 (RDD) |
| Debtors. | Jointly Administered |
| The Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | |
| Plaintiff | Adv. Proc. No. 17-08264 (RDD) |
| v. | |
| McKESSON CORPORATION, | |
| Defendant. | |

| | |
|---|---|
| The Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* <br><br>                Plaintiff <br><br>               v. <br><br>McKESSON PHARMACY SYSTEMS LLC, <br><br>               Defendant. | Adv. Proc. No. 17-08265 (RDD) |
| The Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* <br><br>                Plaintiff <br><br>               v. <br><br>McKESSON SPECIALTY DISTRIBUTION LLC, <br><br>               Defendant. | Adv. Proc. No. 17-08266 (RDD) |

**DEFENDANTS' OPPOSITION TO PLANTIFF'S MOTION TO COMPEL MEDIATION PURSUANT TO PARAGRAPH 1.1 OF THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK'S MEDIATION PROCEDURES**

McKesson Corporation and its corporate affiliates, McKesson Specialty Distribution Corporation and McKesson Pharmacy Systems LLC, (collectively, "McKesson") file this Opposition to the Motion to Compel Mediation (the "Mediation Motion"). As explained in this Opposition, the Court should deny Plaintiff's request for court-mandated mediation in the three pending adversary proceedings. Instead, McKesson's summary judgment motion in the primary preference lawsuit, against McKesson Corporation for nearly $68 million, should be set for hearing and the Court should schedule a case status conference under Bankruptcy Code § 105(d). The reasons for this resolution are follows:

1. Debtors, The Great Atlantic & Pacific Tea Company, Inc., *et al*. (the "Debtors") filed Chapter 11 petitions on July 19, 2015 (the "Petition Date"). They were one of the nation's oldest supermarket and food retailers, operating approximately 300 supermarkets, combination food and drug stores, and specialty food stores across six Northeastern states. The Debtors' primary retail operations consisted of supermarkets operated under a variety of well-known trade names including A&P, Waldbaum's, SuperFresh, Pathmark, Food Basics, and The Food Emporium. As of the Petition Date, 178 of those supermarkets had in-store pharmacies, and McKesson was the Debtors' primary supplier of pharmaceuticals to those pharmacies.

2. From the Petition Date through the Spring of 2016, the Debtors liquidated their supermarkets, in-store pharmacies and other business assets. Using the liquidation proceeds, the Debtors' post-petition financing was repaid. The Debtors' pre-petition secured creditors no longer have any secured claims against the remaining liquidation proceeds. To that end, there is no currently applicable cash collateral stipulation or cash collateral order.[1] It is McKesson's

---

[1] Per the court-approved "Settlement Agreement" between the Committee and the "Secured Creditors," [Docket Nos. 2786, 2868], the Secured Creditors gave the estates $11.25 million in cash. Of that amount, $1.5 million was earmarked to pay the fees and expenses of UFCW professionals. Under the Settlement Agreement, recoveries on avoidance actions are allocated as follows: (i) 75% to the Secured Creditors and 25% to the Debtors' estates from

3

understanding that some or all of the remaining cash—roughly $22.7 million—is unrestricted and available to pay administrative creditors.

3. On July 17, 2019, and on several subsequent dates, the Official Committee of Unsecured Creditors ("Plaintiff" or the "Committee")[2] filed 29 preference lawsuits, including three against McKesson. The three preference lawsuits against McKesson are:

    a. *Creditors' Committee v. McKesson Corp.*, Adv. Pro. No. 17-08264-rdd. In this lawsuit, Plaintiff seeks to recover $67,752,943.44 for payments made during the 90-day preference period to purchase pharmaceutical products.

    b. *Creditors' Committee v. McKesson Pharmacy Systems, LLC*, Adv. Pro. No. 17-08265-rdd. In this lawsuit, Plaintiff seeks to recover $323,260.11 for payments made during the 90-day preference period owed for pharmacy-related hardware and software and related services provided to the Debtors' in-store pharmacies.

    c. *Creditors' Committee v. McKesson Specialty Care Distribution Corp.*, Adv. Pro. No. 17-08266-rdd. In this lawsuit, Plaintiff seeks to recover $102,872.33 for payments made during the 90-day preference period to purchase specialty pharmaceutical products.

4. As McKesson advised the Court in its October 26, 2018 letter, McKesson strongly believes the primary preference lawsuit, the one that seeks recovery of nearly $68 million for

---

the first $10 million of net proceeds, (ii) a 50% split thereafter until that aggregate recovery for the Secured Creditors from proceeds of avoidance actions equals $11.5 million, and (iii) thereafter, 100% of the net proceeds will be distributable to the Debtors' estates. McKesson does not know the current aggregate amount of recoveries on avoidance actions. McKesson also does not know whether that amount is included in the $22.1 million of unrestricted cash currently held by the Debtors and whether the $1.5 million of the settlement funds was paid to UFCW.

[2] The Committee is the nominal plaintiff. By virtue of the Settlement Agreement and the compensation arrangements for Plaintiff's counsel, the real plaintiffs are the Secured Creditors and Plaintiff attorneys prosecuting the avoidance actions. *See* ftnt. 4, *infra*. There is no realistic scenario under which the Committee's statutory constituency—the general unsecured creditors—will realize any recovery from the preference lawsuits against McKesson.

4

pharmaceuticals deliveries to the Debtors' in-store pharmacies, is ready for summary judgment. The primary issues for summary judgment are:

- Whether the 26 payments on each of the 13 Friday due dates during the preference period fall within the ordinary course of business defense to the recovery of preferences. For a decade, McKesson served as Debtors' primary pharmaceutical supplier to their pharmacies. Between April 24, 2015 and July 17, 2015, in 26 payments, Debtors paid McKesson a total of $63,503,218.12, via Automatic Clearing House payments. Consistent with historic payment practices over a decade, each of the payments was made exactly on the Friday due date for the exact amount of the invoices due that day. In the Summary Judgment Motion, through undisputed evidence, McKesson will prove these 26 payments fall within the ordinary course of business defense to the recovery of preferences.

- Whether 4 daily payments—on July 14, 15, 16 and 17, 2015—fall within the contemporaneous exchange of new value defense to the recovery of preferences, when those payments were for goods delivered the previous day. On July 2, 2015, McKesson notified Debtors that the go-forward credit terms for the purchase of pharmaceuticals would be reduced to one-day sales outstanding terms and capped at $1 million per day, starting on July 13, 2015. Over the next 11 days, McKesson and Debtors negotiated go-forward credit terms. On July 13, 2015, McKesson and Debtors agreed to go-forward credit terms of two-day sales outstanding and capped Debtors' daily purchases at $2 million. On July 14 to 17, 2015 and pursuant to the agreed-upon credit terms, Debtors paid McKesson the aggregate amount of $4,249,724.88 in four daily wire transfers. Each of these daily payments was for the amount of pharmaceuticals delivered to Debtors' pharmacies the prior day—from July 13 to July 16, 2015, less certain

5

routine credits. McKesson will prove through undisputed evidence that these payments fall within the contemporaneous exchange of new value defense to the recovery of preferences.

- Whether a substantial portion of the four payments to McKesson from July 14 to July 17, 2015 are insulated from preference recovery under the subsequent extension of new credit defense. On July 14 through 17, 2015, Debtors paid McKesson the aggregate amount of $4,249,724.88 by wire transfer. That aggregate amount is the price for the pharmaceuticals purchased and delivered to Debtors' pharmacies from July 13 to 16, 2015, less some minor credits. Subsequent to each payment, McKesson sold additional pharmaceuticals to Debtors on credit. McKesson will prove, through undisputed evidence, the calculations of the subsequent extensions of new credit and the portion of the $4,249,724.88 which is protected from preference recovery under the subsequent extension of new credit defense.

5. Plaintiff, in its response letter, indicated that these issues are disputed. Yet, Plaintiff fails to explain what those disputes are or why these discrete issues cannot be decided in a summary judgment motion. **For example, is Plaintiff truly disputing that pharmaceutical purchases paid the day after delivery, per agreed credit terms, are not "contemporaneous exchanges of new value?" Similarly, is Plaintiff contending that the 26 at-issue payments made by ACH withdrawals on each of the 13 Friday due dates during the preference period, consistent with a decade of business/payment history, are anything other than ordinary course of business?**

6. The Mediation Motion, and McKesson's unwillingness to participate in an adversary proceeding-only mediation process, must be placed into the broader context of this entire bankruptcy case. This case is woefully and hopelessly administratively insolvent—somewhere between $30 and $40 million. There are $53.4 million in unpaid administrative

claims and only $22,688,930 in cash.³  Based on the most recent financial information provided by the Committee's financial advisors, there may be up to $10 million owed to estate professionals, the Secured Creditors or other parties.  At this point, McKesson is unclear which parties, including the Debtors' estates, have rights to the $22.7 million in cash.

7. This administrative insolvency—whether it is $30 million, $40 million, or some other huge amount—has been long known by the estate professionals, including Committee counsel.  In May 2017, McKesson (through its counsel) asked for a summary of the unpaid administrative claims.  According to a May 2017 spreadsheet provided by the Committee's financial advisors, there were $61.1 million in "Deferred Admin Claims."  The May 21, 2017 through June 17, 2017 Operating Report [Docket No. 3763] listed $29,246,035 in cash.  Thus, as of May 2017, on a cash basis, the Debtors were some $31 million administratively insolvent.

8. By October 2018, the Debtors' unrestricted cash had decreased by $6,557,105. On October 4, 2018, McKesson (through its counsel) asked for an updated summary of the unpaid administrative claims.  According to an October 5, 2018 spreadsheet provided by the Committee's financial advisors, there were $53.4 million in "Deferred Admin Claims."  In that same spreadsheet, the Committee estimated that only $10.4 million of the $22.7 million of cash would be available to pay administrative claims.  That is a less than a 20% recovery on administrative claims.

9. However, this Court was not informed of the magnitude of administrative insolvency.  Instead, due to the actions of both the Debtors and the Committee, this Court has been forced to waste considerable judicial resources handling unnecessary matters.  More than a

---

³ This amount is listed in the Operating Report for the period of August 12, 2018 through September 8, 2018. [Docket No. 4227].  The $22.7 million of cash includes an account with $2,069,944 for "Real Estate Cure—Interest Bearing."  McKesson is uncertain whether the funds in this account are unrestricted, thus available to pay administrative creditors, or potentially earmarked for landlords whose leases were assumed and assigned during the liquidation process.

7

thousand creditors have been similarly burdened.  Starting in April 2016—roughly four months after completing their store liquidations—and continuing through August 2018, the Debtors filed **37 omnibus claim objections** involving over 1,800 claims of all different priorities.  In none of those claim objections, nor during the many hearings on those claim objections, was there any disclosure of the $30 to $40 million of administrative insolvency—even though it was undeniably known by the estate professionals.  Similarly, no mention of administrative insolvency was in any of the 29 preference lawsuits or during the hearings on those lawsuits.

10.    In opposing the scheduling of McKesson's summary judgment motion, Plaintiff professes concern over this Court "expend[ing] its limited resources considering" the motion.  This is the height of hypocrisy.  The Debtors, presumably with the Committee's acquiescence, had no concerns over this Court's resources when they filed 37 omnibus claim objections involving more than 1,800 claims in a hopelessly administratively insolvent bankruptcy case.  Similarly, Plaintiff's professionals had no concern about this Court's resources when they prosecuted 29 preference lawsuits and untold number of preference demands that would never result in recovery by the Committee's statutory constituency—the general unsecured creditors.[4]

11.    This bankruptcy case has reached its end.  The liquidation of the Debtors' operating assets was completed in the Spring of 2016.  All liquidation-related lawsuits against purchasers, or potential purchasers, have been resolved.  Twenty-five of the twenty-nine preference lawsuits have been completed and closed.  All that remains are four preference lawsuits—three against McKesson and one against PepsiCo Inc. and certain affiliates.  As McKesson will establish in its summary judgment motions, no recovery against McKesson is

---

[4] Repeating a point made in footnote 2, *supra*, based on the case economics and the Settlement Agreement, the only real beneficiaries of the preference demands and lawsuits are the Secured Creditors and the Committee's professionals.  Under their retention orders, but subject to Court approval, Committee professional are entitled to be paid (A) the greater of (i) thirty-three percent (33%) of the gross recovery to the estates from each avoidance action; or (ii) (a) an hourly basis charged at fifty (50) percent of the professionals' standard hourly rates then in effect for work expended in pursuing an avoidance action, plus (B) reimbursement of all actual and necessary expenses.

permissible. McKesson understands that PepsiCo has equally strong defenses to the $21 million avoidance/breach of contract claims. Objectively, there is no realistic possibility that recoveries in these four remaining lawsuits will be material or significantly reduce the massive administrative insolvency of this case.

12. Without paying administrative claims in full, a plan of liquidation cannot be confirmed. *See* 11 U.S.C. § 1129(a)(9)(A). McKesson, which holds an unpaid $1.8 million administrative expense claim, will oppose any plan that does not pay that claim in full on the plan's effective date, as required by the Code. Thus, the most likely outcome of this case, consistent with the outcomes in similar administratively insolvency bankruptcy cases, is an agreed-upon dismissal under which the $22.7 million of cash, or whatever cash is available for the Debtors' estates, is distributed pro rata to the $53 million in administrative creditors, including McKesson. And, upon dismissal of this bankruptcy case, unless this Court order otherwise, all avoidance recoveries—including all preference settlements—would need to be returned to the preference defendants. *See* 11 U.S.C. § 349(b) ("Unless the court, for cause, orders otherwise, a dismissal of a case … (1) reinstates—(B) any transfer avoided under section … 547 … of this title[.]")[5]

13. For all of these reasons, McKesson opposes mediation in the three adversary proceedings. At this time, McKesson is not interested in engaging in settlement discussions or mediation with Plaintiff.

14. On the other hand, pursuant to Bankruptcy Code Section 105(d), this Court should conduct an immediate status conference in the Debtors' bankruptcy case. Section 105(d)

---

[5] According to the Fifth Certification Regarding Settlement of Preference Claims, filed on August 28, 2018, [Docket No. 4166], there have been 69 settlements of preference demands and lawsuits. That Certification does not disclose the aggregate amount of preference settlements paid by the settling parties. Nevertheless, consistent with the statutory language and intent of § 349(b), and unless the settling parties waived their rights under § 349(b), upon dismissal of this bankruptcy case, those settlement payments will need to be returned to the settling parties.

authorizes the Court to hold "status conferences as are necessary to further the expeditious and economical resolution of the case." If any bankruptcy case warrants an immediate Section 105(d) status conference, it is this one. Otherwise, the $22.7 million of available cash will continue to be depleted in the pursuit of pointless preference litigation and claim objections, while the only real stakeholders—the administrative creditors holding $53 million of "deferred administrative claims"—see their recoveries fritted away.

For all of these reasons, the Mediation Motion must be denied. Instead, pursuant to Bankruptcy Code Section 105(d), this Court should hold a case status conference in order to determine the best way to conclude this case and distribute the remaining cash to the administrative creditors.

DATED: November 7, 2018

BUCHALTER, A Professional Corporation

By:  /s/ *Jeffrey K. Garfinkle*
Jeffrey K. Garfinkle, Esq.
(Cal Bar. No. 153496; admitted *pro hac vice*)
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612
Telephone: (949) 760-1121
jgarfinkle@buchalter.com

and

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS LLP
Tracy L. Klestadt, Esq.
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
TKlestadt@Klestadt.com

Attorneys for Defendants, McKesson Corporation, McKesson Specialty Distribution Corporation and McKesson Pharmacy Systems LLC